**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA**

| | |
|---|---|
| PHARMACEUTICAL RESEARCH AND MANUFACTURERS OF AMERICA, | Case No. _____ |
| *Plaintiff,* | Hon. _____ |
| v. | |
| NICHOLAS W. BROWN, in his official capacity as Attorney General for the State of Washington; and RYAN MORAN, in his official capacity as Director of the Washington State Health Care Authority, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| *Defendants.* | |

CAPTION - 1
(No. _____)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Plaintiff Pharmaceutical Research and Manufacturers of America ("PhRMA") brings this complaint against Nicholas W. Brown, in his official capacity as the Attorney General of Washington, and Ryan Moran, in his official capacity as Director of the Washington State Health Care Authority, seeking declaratory and injunctive relief against Washington Senate Bill 5981 ("S.B. 5981").

## PRELIMINARY STATEMENT

1. This case is about the constitutional balance between state and federal power. Congress created a federal healthcare initiative called the 340B Program ("340B" or the "Program") to provide certain non-profit healthcare providers with access to reduced-priced medicines. The 340B Program is federal from top to bottom. Congress created the Program using its Article I spending power, enticing pharmaceutical manufacturers to sign up by making participation in 340B a condition of having the federal government spend federal dollars reimbursing their drugs under Medicare and Medicaid. Congress carefully defined the scope—and limits—of manufacturers' obligations under the Program and the universe of providers entitled to reduced pricing under it (known as "covered entities"). Congress gave a federal agency exclusive power to administer and enforce the Program. And, in stark contrast to cooperative federalism programs like Medicaid, Congress assigned no role to the states.

2. For years, the Program worked as Congress intended. But things started to change around 2010, when covered entities began contracting with for-profit pharmacy chains at skyrocketing rates and extending to them benefits that Congress confined to a carefully circumscribed group of non-profit healthcare providers— drastically increasing the risk of fraud and abuse in the Program. Many manu- facturers individually responded to those alarming developments by requiring

COMPLAINT - 2
(No. _____ )

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

covered entities who want to purchase their drugs at sharply reduced 340B prices to agree to contract with no more than one outside pharmacy, and to share basic information about transactions for which 340B pricing is sought so that manufacturers could verify they were actually eligible for that pricing.

3.     Both federal courts of appeals to consider these contract-pharmacy and claims-data conditions held that the 340B statute gives manufacturers a federal right to impose those kinds of reasonable conditions on their offers to sell drugs to covered entities at 340B prices—and, accordingly, that offers to sell drugs at 340B prices contingent on acceptance of those conditions are valid under federal law. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024); *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 703-04 (3d Cir. 2023). But contract pharmacies and their allies in state legislatures refused to take no for an answer, and a host of states responded by enacting laws that attempt to reshape the 340B Program to their liking.

4.     Washington's Senate Bill 5981 ("S.B. 5981") is one such effort. S.B. 5981 prohibits manufacturers that participate in the 340B Program from imposing the very contract-pharmacy and claims-data conditions on their offers to sell drugs at 340B prices that two Circuits have held federal law permits. By its own admission, Washington did so to "ensure" what it views as "the integrity of the 340B program," and ensure that "the program is operating within" what Washington views as "the original intent set forth by congress." S.B. 5981, §1(8), (9). But it is not *Washington's* role to enact laws in an effort to fix what it perceives as flaws in the federal 340B Program; to the extent there are any such flaws, that task belongs to the federal government alone. Yet by requiring manufacturers to sell drugs at 340B prices to covered entities that refuse to accede to reasonable terms on 340B offers, S.B. 5981 compels manufacturers to sell their drugs at reduced prices in

circumstances where Congress did not. That contradicts, not complements, Congress's careful design of the 340B Program. More troubling still, S.B. 5981 targets only manufacturers that participate in the 340B Program. Every other pharmaceutical manufacturer that does business in Washington remains free to sell—or not sell—its drugs on whatever reasonable terms it desires. In short, the whole point of S.B. 5981 is to alter manufacturers' obligations under the federal 340B Program, and thus remake that Program to the state's own liking.

5.    That violates the Supremacy Clause. The Supreme Court has consistently held that the Constitution displaces state laws that single out the federal government or those with whom it deals for special burdens, directly target the federal government, or intrude in an area of uniquely federal interest. S.B. 5981 does all those things. It singles out manufacturers for burdensome regulation only if they have chosen to participate in the federal 340B Program. It deprives the federal government of the ability to set the terms of its agreements with those program participants and forces the federal agency that administers 340B to police tens of thousands of additional entities and transactions—while depriving manufacturers of the ability to help identify potential program violations. And it wrests control from the federal government over the contours of a federal spending program. S.B. 5981 thus violates the Supremacy Clause at every turn.

6.    S.B. 5981 is also preempted by the federal 340B statute. The 340B Program "originates from, is governed by, and terminates according to federal law." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001). S.B. 5981 unlawfully inserts the state into that federally defined field, and it impedes the operation of the 340B Program in practice. It imposes on manufacturers obligations that Congress did not—including novel disclosure obligations that force

COMPLAINT - 4
(No. _____)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

manufacturers to report proprietary pricing information that Congress meant to keep private, which conflicts with the federal 340B statute, and raises serious compelled-speech concerns under the First Amendment. It also makes it virtually impossible for manufacturers to avail themselves of the audit procedures Congress created to help them aid in detecting and addressing fraud and abuse in the 340B Program. And it injects Washington into the exclusively federal administrative enforcement regime Congress created.

7. This Court should enjoin and declare unlawful S.B. 5981 to prevent Washington State from redefining the contours of a federal spending program in which Congress has given it no role.

## JURISDICTION AND VENUE

8. PhRMA's causes of action arise under 28 U.S.C. §1331, 42 U.S.C. §1983, and the United States Constitution. The Court has jurisdiction under 28 U.S.C. §§1331 and 1343(a)(3).

9. The Declaratory Judgment Act provides that, in a case of actual controversy within its jurisdiction, a United States court may declare the rights and other legal relations of any interested party seeking such declaration. 28 U.S.C. §2201(a).

10. This Court has inherent equitable powers to enjoin the actions of state officials if they contradict the federal Constitution or federal law. *Ex parte Young*, 209 U.S. 123, 159-60 (1908); *accord, e.g.*, *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

11. Venue is proper in this District because this action challenges a Washington law applicable to the sale of PhRMA's members' drugs in this District, and thus S.B. 5981 purports to directly restrict and restrain PhRMA's members'

COMPLAINT - 5
(No. _____)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

conduct in selling and distributing drugs within this District.  28 U.S.C. §1391(b)(2).

12.    Substantial amounts of PhRMA's members' medicines are sold under the 340B Program to covered entities in this District.  For example, the U.S. Department of Health and Human Services' ("HHS") website reflects that there are numerous covered entity sites in the Western District of Washington.  *See* Health Res. & Servs. Admin., Covered Entity Search Criteria, https://340bopais.hrsa.gov/SearchCe (last visited Apr. 9, 2026).  The same website reflects that those covered entities maintain a substantial number of contract pharmacy arrangements, including with contract pharmacies in this District.  *Id*. Accordingly, S.B. 5981 is likely to be enforced against PhRMA members in this District.

13.    PhRMA's members are directly regulated by S.B. 5981.  The provisions in that law require PhRMA's members to take certain actions that they would not otherwise take but for S.B. 5981.  The conduct that the law requires imposes tangible costs on PhRMA's members.

14.    Venue is also proper in this District because the Defendants maintain their principal offices in this District.  28 U.S.C. §1391(b)(1).

## **PARTIES & STANDING**

15.    PhRMA, a trade association representing the nation's leading innovative biopharmaceutical research companies, advocates for policies that encourage the discovery and development of important new pharmaceutical products.  PhRMA's members, which manufacture and sell pharmaceutical products, participate in the federal 340B Program and will thus be forced to supply their drugs at steeply reduced prices under S.B. 5981 in circumstances where Congress has not required them to do so or otherwise face potential criminal penalties.

COMPLAINT - 6
(No. _____)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

16. Neither the claims asserted nor the relief sought in the Complaint requires the participation of any individual member of PhRMA.

17. Defendant Nicholas Brown is the Attorney General of the State of Washington and is sued in his official capacity. The Attorney General is authorized to prosecute violations of S.B. 5981. *See* S.B. 5981, §4(2). The Attorney General maintains his principal office in this District at 1125 Washington Street SE, Olympia, WA 98504.

18. Defendant Ryan Moran is the Director of the Washington State Health Care Authority and is sued in his official capacity. The Director is authorized to impose fines against manufacturers that participate in the federal 340B Program for failing to comply with S.B. 5981's disclosure obligations. *See* S.B. 5981, §10. The Director maintains his principal office in this District at 626 8th Avenue SE, Olympia, WA 98501.

## STATEMENT OF THE CASE

### I.    Legal Background

19. When it comes to prescription-drug purchasing, the federal government is the biggest game in town by far. Every year, the federal government spends more than $100 billion on prescription drugs through federal healthcare programs. *See* Ctrs. for Medicare & Medicaid Servs., *NHE Fact Sheet* (June 24, 2025), https://perma.cc/W944-TZH7. But rather than purchase prescription drugs directly, the federal government typically uses federal funds to reimburse drugs purchased by healthcare providers and furnished to Medicaid or Medicare beneficiaries, which collectively account for "almost half the annual nationwide spending on prescription drugs." *Sanofi*, 58 F.4th at 699.

COMPLAINT - 7
(No. _____)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

20.    For pharmaceutical manufacturers, access to that federally funded market comes with certain federal strings attached.  Manufacturers cannot sell their drugs on that federally funded market unless they agree to participate in Medicaid and Medicare Part B.  *See* 42 U.S.C. §1396r-8(a)(1).  And, to participate in Medicaid and Medicare Part B, manufacturers must also agree to participate in a federal healthcare initiative called the 340B Program, *see id.* §§256b(a)(1), 1396r-8(a)(5), which "imposes ceilings on prices drug manufacturers may charge for medications sold to specified health-care facilities," *Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110, 113 (2011).

21.    Manufacturers that agree to participate in the 340B Program must execute a contract with the federal government known as a Pharmaceutical Pricing Agreement, or PPA.  *Astra*, 563 U.S. at 115; *see* Sample PPA (attached as **Exhibit A**).  Tracking the 340B statute, the PPA defines the manufacturer's rights and duties under the Program.  The core command under both the 340B statute and the PPA is that manufacturers must "offer" certain outpatient drugs "for purchase at or below the applicable [federally defined] ceiling price," which is typically steeply reduced—indeed, sometimes as low as a penny per pill.  42 U.S.C. §256b(a)(1); *see* Sample PPA Addendum (attached as **Exhibit B**).  The manufacturer must extend that offer only to "covered entit[ies]," a statutorily designated list of 15 types of non-profit healthcare providers.  Sample PPA Addendum at 1; *see* 42 U.S.C. §256b(a)(4) (listing entities).

22.    While those covered entities typically serve a high volume of vulnerable and low-income patients, covered entities do not have to pass on to their patients the cost-savings they achieve by purchasing reduced-price drugs under the 340B Program.  They are instead free to sell to patients at full price drugs that they

COMPLAINT - 8
(No. _____)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

purchased at the 340B price and then pocket the difference.  So, while needy patients are supposed to benefit, the 340B Program most directly benefits covered entities.

23.    PPAs, which "incorporate" a manufacturer's statutory "obligations and record [its] agreement to abide by" them, *Astra*, 563 U.S. at 118, are a foundational element of the 340B Program.  Indeed, the Program could not exist without them.  Congress did not create the 340B Program through its ordinary lawmaking power, which imposes obligations on regulated entities involuntarily.  It almost certainly could not have, as forcing manufacturers to sell their drugs at steeply reduced prices would raise serious constitutional concerns.  *See Horne v. Dep't of Agric.*, 576 U.S. 350 (2015).  Congress instead enticed manufacturers to enter the 340B Program with the promise of access to the all-important federal Medicaid and Medicare Part B markets.  The 340B Program thus is designed to "operate[] based on consent," *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022), with the PPA memorializing the manufacturer's agreement to participate.  PPAs include "nonrenewal and termination" provisions that entitle manufacturers to exit 340B "for any reason," and they "shall be construed in accordance with Federal common law." Sample PPA at 8-9 (formatting altered).

24.    Because participation in Medicare, Medicaid, and 340B rise and fall together, Congress must ensure that the benefits of participation in Medicare and Medicaid outweigh the burdens of participation in 340B—and prevent either from becoming unduly coercive.  *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581-82 (2012).  That is why, among other things, Congress circumscribed the universe of entities eligible for reduced prices.  No for-profit entities appear on the statutory list of covered entities.  42 U.S.C. §256b(a)(4).

COMPLAINT - 9
(No. _____ )

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

25.    The 340B Program also imposes obligations on covered entities to prevent them from exploiting manufacturers.  Because covered entities can purchase drugs at steeply reduced prices, they could profit enormously from selling those reduced-price drugs to third parties at full price and pocketing the margin.  Congress thus commanded that covered entities "shall not resell or otherwise transfer the drug to a person who is not a patient of the entity," a practice known as diversion.  *Id.* §256b(a)(5)(B).  Congress also forbade covered entities from generating "duplicate discounts," *i.e.*, forcing a manufacturer to pay a Medicaid rebate on a drug that was purchased at a reduced price under the 340B Program.  *Id.* §256b(a)(5)(A).  And Congress made covered entities that engage in either of those practices liable to manufacturers for the amount of their ill-gotten gains.  *Id.* §256b(a)(5)(D).  Together, the prohibitions against diversion and duplicate discounts are intended to "assure the integrity of the drug price limitation program."  H.R. Rep. No. 102-384(II), at 16 (1992).

26.    Congress vested the U.S. Department of Health and Human Services ("HHS") with the responsibility to administer and enforce the 340B Program.  HHS in turn delegated that responsibility to the Health Resources and Services Administration ("HRSA").  Among other 340B-related responsibilities, HRSA oversees two critical components of the federal 340B statute's enforcement regime: audits and dispute resolution.

27.    The auditing process allows both HRSA and drug manufacturers to review a covered entity's records to verify that it is not diverting drugs or generating duplicate discounts.  *See* 42 U.S.C. §256b(a)(5)(C).  But a manufacturer can "conduct an audit only when it has documentation which indicates that there is reasonable cause" to believe that a covered entity violated those statutory

COMPLAINT - 10
(No. _____)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

prohibitions.  61 Fed. Reg. 65,406, 65,409 (Dec. 12, 1996).  HRSA guidelines set a high bar to conduct an audit:  Manufacturers must produce a detailed audit plan that "set[s] forth a clear description of [their] reasonable cause," identifies "sufficient facts and evidence," and supplies supporting documentation.  *Id.* at 65,410.

28.    Armed with whatever evidence the audit uncovers—assuming a manufacturer can meet the prerequisites for conducting an audit—manufacturers present their evidence of program violations to an administrative dispute resolution ("ADR") panel, which decides whether the covered entity violated the statutory prohibitions against diversion or duplicate discounting.  *See* 42 C.F.R. §§10.21, 10.23.  The agency's final decision in these ADR proceedings is subject to judicial review in federal court.  *See id.* §10.23(c).

## II.    Factual and Procedural Background

29.    Congress designed 340B to benefit only certain non-profit healthcare providers; pharmacies were not given any role in, or entitled to any benefits under, the Program.  Some covered entities, however, ran into a logistical problem:  Not all of them had an in-house pharmacy through which they could dispense outpatient drugs, whether acquired at 340B prices or otherwise, to their patients.  61 Fed. Reg. 43,549, 43,550 (Aug. 23, 1996).

30.    To remedy that problem, HRSA issued guidance in 1996 authorizing each covered entity to contract with one outside pharmacy to dispense 340B-priced drugs to its patients.  That guidance allowed a covered entity to purchase 340B-priced drugs but have them delivered to and dispensed by that pharmacy, so long as the pharmacy was contractually the covered entity's "agent," and the covered entity retained title to the drugs at all times.  *Id.* at 43,550, 43,555.  Although the guidance allowed covered entities to enter into a contractual arrangement with one outside

COMPLAINT - 11
(No. _____)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

pharmacy, HRSA emphasized that "the use of contract services [would] only provid[e] those covered entities (which would otherwise be unable to participate in the program) a process for accessing 340B pricing." *Id.* at 43,550, 43,551. HRSA responded to concerns about diversion by stressing that manufacturers could "detect and eliminate" abuse through audits and the ADR process. *Id.* at 43,553.

31. In 2010, HRSA abruptly "swerved." *Novartis*, 102 F.4th at 457. For the first time, it took the position that covered entities could contract with an unlimited number of outside pharmacies to dispense 340B-priced drugs, without regard to the proximity of the pharmacy to the covered entity (and its patients). 75 Fed. Reg. 10,272 (Mar. 5, 2010). The number of outside pharmacies contracting with covered entities soon soared from roughly 1,300 in 2010 to upwards of 30,000. *See* Majority Staff Rep. of S. Comm. on Health, Educ., Lab. & Pensions, *Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Program* 3 (2025), https://perma.cc/C83U-VRPX. As of 2020, the average covered entity was contracting with 22 pharmacies—and passing along to major pharmacies like Walgreens and CVS a share of the revenue it brought in from securing insurance reimbursements at or near full price for drugs purchased at a 340B discount. *See* Aaron Vandervelde et al., *For-Profit Pharmacy Participation in the 340B Program* 7 (2020), https://perma.cc/365X-UXGY. These arrangements increased the number of 340B price reductions claimed by covered entities far beyond any corresponding increase in their patient base. *See* Adam J. Fein, *New HRSA Data: 340B Program Reached $29.9 Billion in 2019*, Drug Channels (June 9, 2020), https://perma.cc/B759-WJTZ.

32. Federal watchdogs warned that the explosion of contract pharmacies heightened the potential for diversion and abuse in the 340B Program. U.S. Gov't

COMPLAINT - 12
(No. _____)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Accountability Off., GAO-18-480, *Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement* 43-45 (2018), https://perma.cc/BK6S-WG5M ("2018 GAO Report").  HRSA audits reveal that contract pharmacies have accounted for nearly two-thirds of documented cases of diversion since that explosion began.  *Id.* at 44.  That stems in part from covered entities' failure to adequately oversee their contract pharmacies.  *See id.* at 43-44. Despite HRSA's admonitions that "the covered entity" must be "ultimately responsible for assuring full compliance with 340B," 75 Fed. Reg. at 10,276, nearly one in three entities audited by the agency "had no documented processes for conducting contract pharmacy oversight," 2018 GAO Report, *supra*.  And because neither covered entities nor their contract pharmacies are required to pass along to patients the savings they realize from the 340B Program, both have strong incentives to classify as many transactions as possible as 340B-eligible.

33.    The so-called product "replenishment model" that pharmacies use to acquire and dispense 340B-priced drugs on behalf of covered entities makes it even easier for them to do so.  Under that model, contract pharmacies sell drugs from their general inventories to all customers at prices significantly above the 340B price, without making any inquiry into who is or is not a patient of a covered entity.  After those transactions occur, the pharmacies use undisclosed algorithms that purport to retroactively identify customers that have some relationship with a covered entity. The pharmacies then use the covered entity's 340B status to replenish their inventory with drugs purchased at the 340B price.  The covered entity, in turn, shares with the pharmacy part of the margin between the full-retail-price sale that the pharmacy made and the reduced price that the covered entity paid.

34.    All of this has proven extraordinarily profitable for major for-profit

COMPLAINT - 13
(No. _____ )

pharmacies. As reflected in a recent report, approximately $1 out of $6 of gross revenue earned by covered entities nationwide went to contract pharmacies and third-party administrators, who run the black-box algorithms to find allegedly 340B-eligible patients. *See* Minn. Dep't of Health, *340B Covered Entity Report* 9 (2024), https://perma.cc/Z7KV-CF2U. Both CVS and Walgreens, two of the largest for-profit retail pharmacies in the country, have publicly disclosed that 340B profits are material to their finances—and that a reduction in 340B contract-pharmacy arrangements "could materially and adversely affect" their bottom lines. CVS, Annual Report (Form 10-K) at 23 (2024), https://perma.cc/J5GD-WB5H; *accord* Walgreens, Annual Report (Form 10-K) at 30 (2024), https://perma.cc/YFA8-HNPE.

35. Eventually, drug manufacturers—including many of PhRMA's members—individually started trying to address these concerns by imposing conditions on the sale of their drugs to covered entities at 340B prices.[1] Although there were variations in these policies, two conditions were common features: Many manufacturers individually began requiring covered entities seeking to purchase their drugs at 340B prices to agree to (1) contract with no more than one outside pharmacy to dispense the drugs (and, under some manufacturers' policies, only if they did not have an inhouse pharmacy), as HRSA originally envisioned, *see* ¶¶29-30, *supra*, and (2) provide claims data about the transactions for which they claim 340B pricing, so the manufacturer can verify that no diversion or duplicate discounting has occurred.

36. In 2021, HRSA informed manufacturers that it believed that those conditions violated the federal 340B statute and manufacturers' PPAs. *Novartis*, 102

---

[1] For information on many PhRMA members' policies, see *340B ESP Sources*, https://perma.cc/46M7-GTPF (last visited Apr. 10, 2026).

COMPLAINT - 14
(No. _____)

F.4th at 458-59.  HRSA took the position that manufacturers could not impose *any* conditions on their 340B offers and that covered entities could contract with as many pharmacies as they choose—whether it is "a neighborhood pharmacy" or, as the agency itself put it, a hypothetical pharmacy located on "the lunar surface."  HHS Off. of Sec'y, Advisory Opinion No. 20-06, *Contract Pharmacies Under the 340B Program* 2-3 (Dec. 30, 2020), https://perma.cc/7SAM-VBML.

37.  Litigation ensued.  Once the dust settled, manufacturers emerged victorious.  Both federal courts of appeals to weigh in agreed that federal law entitles manufacturers to impose the conditions that HRSA claimed were unlawful.  *See Novartis*, 102 F.4th at 459-64; *Sanofi*, 58 F.4th at 703-06.  Those decisions explained that the federal 340B statute preserves a manufacturer's right to impose reasonable terms on its 340B offer—including restrictions on how many contract pharmacies a covered entity may use and requirements that covered entities supply claims data relating to 340B-priced drugs.  *Novartis*, 102 F.4th at 459-64; *Sanofi*, 58 F.4th at 703-06.  While both courts noted that refusing to allow a covered entity to use even *one* contract pharmacy may be so restrictive as to violate the obligation to make a *bona fide* offer to sell drugs at 340B prices, both courts emphatically rejected HRSA's position that the 340B statute forbids manufacturers from imposing the kinds of conditions manufacturers had been imposing.

38.  Dissatisfied with the federal outcomes to date, covered entities and their contract-pharmacy partners turned to lobbying states.  Over the past few years, they began persuading states to pass laws that seek to mandate under *state* law 340B-program obligations that the Third and D.C. Circuits held *federal* law does not require.  In particular, these laws make it illegal for manufacturers who participate in 340B to condition their offers to sell drugs at 340B prices on a covered entity's

COMPLAINT - 15
(No. _____)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

agreement to use no more than one contract pharmacy and to provide claims data.

39. S.B. 5981, which takes effect on June 11, 2026, is one such law. S.B. 5981 provides that "[a] manufacturer" who participates in 340B "may not":

(1) deny, restrict, or prohibit the acquisition of a 340B drug by, or delivery of a 340B drug to, a covered entity, a pharmacy that is under contract with a covered entity to receive and dispense a 340B drug on behalf of the covered entity, or any location authorized by a covered entity to receive such 340B drug, unless federal law prohibits receipt of the 340B drug[; or]

(2) … require a covered entity to submit any claims, utilization, purchasing, or other data as a condition for allowing the acquisition of a 340B drug by, or delivery of a 340B drug to, a covered entity, a pharmacy that is under contract with a covered entity to receive and dispense a 340B drug on behalf of the covered entity, or any location authorized by a covered entity to receive such 340B drug, unless federal law requires such data sharing.

S.B. 5981, §3(1)-(2).

40. S.B. 5981 is, by its terms, entirely parasitic to the federal 340B Program. It defines "340B drug" to mean "a drug that has been subject to an offer for reduced prices by a manufacturer under 42 U.S.C. [§]256b and is purchased by a covered entity." *Id.* §2(1). And it defines a "[c]overed entity" as "an entity authorized to participate in the federal 340B drug pricing program, as defined in 42 U.S.C. [§]256b(a)(4) as of the effective date of this section." *Id.* §2(2). That definition singles out a subset of entities listed in the federal definition of "covered entity." *See* 42 U.S.C. §256b(a)(4). S.B. 5981 also requires manufacturers to

COMPLAINT - 16
(No. _____)

disclose certain data, including "the number of" 340B-priced drugs sold to "each covered entity and contract pharmacy in Washington," and the "average 340B discount on each of the top 25 340B drugs dispensed in the state by each manufacturer." S.B. 5981, §9(7)(a), (b).

41.    S.B. 5981 thus regulates participation in the federal 340B Program overtly and exclusively:  It makes it illegal as a matter of Washington law for manufacturers in that federal program to condition their (federally defined) "offers" to sell (a federally defined subset of) their drugs to (a set of federally defined) covered entities at the (federally defined) 340B price on the (federally defined) covered entities' agreement to contract-pharmacy and claims-data terms *that manufacturers are entitled to impose as a matter of federal law*.  The ultimate effect of S.B. 5981, then, is not only to force manufacturers who participate in the 340B Program to change the terms of their 340B offers, but also to compel them to sell their drugs at 340B prices in situations where they would not have to do so but for Washington's law.

42.    That is the point.  As the state legislature explained in its statutorily enacted statement of purpose, Washington chose to expand manufacturers' obligations under the federal 340B Program to "ensure the integrity of the 340B program" as Washington thinks it should operate, and it redefined the program's terms to "ensure the program is operating within the original intent set forth by congress"—again, as Washington perceives it.  S.B. 5981, §1(8), (9).  The state has thus unabashedly taken the design and operation of the federal 340B Program into its own hands.

COMPLAINT - 17
(No. _____)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

## CLAIMS FOR RELIEF

### COUNT ONE

### Supremacy Clause

### (42 U.S.C. §1983, *Ex parte Young*)

43.    PhRMA re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

44.    The Constitution, federal statutes, and treaties are "the supreme Law of the Land."  U.S. Const. art. VI, cl. 2.  Accordingly, when state and federal law conflict, "federal law takes precedence."  *Kansas v. Garcia*, 589 U.S. 191, 202 (2020) (quoting *Murphy v. NCAA*, 584 U.S. 453, 477 (2018)).

45.    Federal law displaces state law when a state law invades a field reserved to the federal government by, or conflicts with, a federal statute (field and conflict preemption, respectively).  The Supremacy Clause itself also forecloses some types of state laws of its own force.  *See CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 321 (3d Cir. 2025).  In particular, unless Congress expressly empowers them to do so, states cannot single out "the Federal Government or those with whom it deals" for special obligations or prohibitions or directly regulate the operations of the federal government.  *United States v. Washington*, 596 U.S. 832, 838 (2022).  Together, those intergovernmental-immunity and preemption principles compel the conclusion that "state statutes may not interfere with the implementation of a federal program by a federal agency" unless Congress invites state participation.  *Forest Park II v. Hadley*, 336 F.3d 724, 732 (8th Cir. 2003).

46.    S.B. 5981 transgresses those principles.

47.    First, S.B. 5981 impermissibly regulates an exclusively federal program.  S.B. 5981 is not a generally applicable regulation of drug manufacturers,

COMPLAINT - 18
(No. _____)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

healthcare providers, pharmacies, or anyone else. It imposes obligations on manufactures if—but only if—they participate in the federal 340B Program. By singling out for special regulation participants (and participation) in a program that "originates from, is governed by, and terminates according to federal law," *Buckman*, 531 U.S. at 347, S.B. 5981 is a naked and unlawful attempt to reconfigure the federal 340B Program more to Washington's liking. Thus, whether viewed through the lens of intergovernmental immunity or field preemption, Washington's effort to insert itself into an exclusively federal program "is inconsistent with the supremacy of the federal law made pursuant to the Constitution." *Forest Park II*, 336 F.3d at 732.

48.    S.B. 5981 also runs afoul of the rule that "the activities of the Federal Government [must be] free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). PPAs are federal contracts, and as such are "governed exclusively by federal law." *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988). Absent clear congressional authorization, then, states have no power to add to manufacturers' obligations under their PPAs or the 340B statute. *Washington*, 596 U.S. at 835. But S.B. 5981 does exactly that by impermissibly modifying a manufacturer's obligations under the federal 340B Program and by saddling the federal government with additional regulatory responsibilities.

49.    Second, Washington's intrusion into the exclusively federal 340B Program creates all manner of conflicts with Congress's intended design. S.B. 5981 "alters the 340B program's fundamental bargain" by requiring manufacturers to sell drugs to covered entities at 340B prices when federal law does not. *Pharm. Res. & Mfrs. of Am. v. McCuskey*, 2026 WL 898259, at *9 (4th Cir. 2026). The way S.B. 5981 does so is simple: It requires manufacturers to sell their drugs to contract pharmacies at a discount when they would otherwise be delivered at full price. But

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

for S.B. 5981, manufacturers could and would exercise their discretion to decline to sell their drugs at heavily reduced 340B prices unless covered entities agree to their one-contract-pharmacy and claims-data conditions. S.B. 5981 stops them from doing so. Indeed, that is the whole point: Washington wants to "ensure the integrity of the 340B program" *as perceived by Washington* by extending it far beyond where Congress was willing to go. S.B. 5981, §1(8). S.B. 5981 thus both imposes obligations "not contemplated by Congress," *Sperry v. Florida ex rel. Fla. Bar*, 373 U.S. 379, 385 (1963), and creates a situation in which federal law "authorizes" participating manufacturers "to engage in activities that the State Statute expressly forbids," *Barnett Bank v. Nelson*, 517 U.S. 25, 31 (1996).

50. S.B. 5981's prohibition on claims-data conditions conflicts with federal law by frustrating manufacturers' ability to help detect abuse of the 340B Program, as Congress intended. The federal 340B Program expressly contemplates that manufacturers will help detect potential fraud and abuse by conducting audits of covered entities and bringing potential violations to HRSA's attention. 42 U.S.C. §256b(d)(3)(B)(iv). Yet federal law makes clear that manufacturers cannot participate in ADR unless they first audit a covered entity. *Id.* And manufacturers cannot simply conduct an audit of a covered entity whenever they wish: To conduct an audit, a manufacturer must provide "documentation" to HRSA establishing "reasonable cause" to believe that a covered entity is violating the prohibitions on diversion or duplicate discounting. 61 Fed. Reg. at 65,409. S.B. 5981's ban on claims-data conditions interferes with a manufacturer's ability to supply that reasonable cause, and frustrates a manufacturer's ability to participate in the Inflation Reduction Act's Medicare Drug Price Negotiation Program.

51. Finally, S.B. 5981 conflicts with the federal 340B Program's exclusive

COMPLAINT - 20
(No. _____)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

federal administrative and enforcement regime.  Congress designed the 340B Program to operate as a single, nationally uniform program with a sole federal agency decisionmaker and enforcer.  But S.B. 5981 appropriates HRSA's exclusive authority to administer 340B nationwide, empowering state actors to make decisions about how the program should operate without any involvement from HRSA.  That "interfer[es] … at an operational level with HHS's enforcement authority." *McCuskey*, 2026 WL 898259, at *12.  Adding insult to injury, S.B. 5981 also permits covered entities and contract pharmacies to bring private actions to enforce the statute's prohibitions on contract-pharmacy and claims-data policies, S.B. 5981, §4(1), even though the Court made clear that "suits by 340B entities would undermine the agency's efforts to administer both Medicaid and §340B harmoniously and on a uniform, nationwide basis." *Astra*, 563 U.S. at 120; *see also id*. at 114 (federal control over 340B Program cannot "be maintained were potentially thousands of covered entities permitted to bring suits alleging" entitlement to 340B prices).  That attempt to empower Washington to police compliance with 340B cannot be squared with federal law.  *See, e.g.*, *McCuskey*, 2026 WL 898259, at *11 (so holding as to West Virginia's similar law).

52.   As if to make its desire to take over the administration of the federal 340B Program clearer still, S.B. 5981 forces manufacturers to disclose confidential data that could allow states to learn ceiling-price information that federal law requires to be kept private.  HRSA treats "[c]eiling prices"—the amount that manufacturers must offer qualifying drugs to covered entities—as "confidential information due to the proprietary nature of the underlying data."  Health Res. & Serv. Admin., Off. of Pharm. Affairs, 340B OPAIS, *Getting Started*, https://perma.cc/3TSP-RRKA (last visited April 9, 2026).  As such, the 340B statute

COMPLAINT - 21
(No. _____)

contains strict limitations designed to protect the "privileged pricing data from unauthorized re-disclosure." 42 U.S.C. §256b(d)(1)(B)(iii).  But S.B. 5981 vitiates those protections by forcing manufacturers to disclose to the state "[t]he number of units, by drug, of 340B drugs distributed to each covered entity and contract pharmacy in Washington," "[t]he aggregate discounts, by drug, provided to each covered entity and contract pharmacy," and "[t]he average 340B discount on each of the top 25 340B drugs dispensed in the state by each manufacturer."  S.B. 5981, §9(7).  With that data, the state can potentially reverse engineer proprietary ceiling-price information.  Not only does that squarely conflict with the confidentiality that federal law affords that information, but it also raises serious First Amendment concerns by compelling speech.  *See X Corp. v. Bonta*, 116 F.4th 888, 898, 903 (9th Cir. 2024).

53.   What is more, those disclosure obligations suggest that Washington believes its role is (*contra Astra*) to "ensure the integrity of the 340B program" by policing overcharges and covered-entity misconduct.  S.B. 5981, §1(8).  But the federal 340B statute makes Congress and HHS—not states—responsible for ensuring program integrity.

**COUNT TWO**

**Commerce Clause**

**(42 U.S.C. §1983, *Ex parte Young*)**

54.   PhRMA re-alleges and incorporates the allegations in the preceding paragraphs of this Complaint.

55.   The understanding that states may not intrude on other states' regulatory powers follows from and is confirmed by several constitutional provisions.  States are denied certain powers that a sovereign might ordinarily

COMPLAINT - 22
(No. _____)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

impose, U.S. Const. art. I, §10, and required to honor certain rights of other states, U.S. Const. art. IV, §§1-3. Similarly, the Due Process Clause limits a state's ability to regulate conduct occurring wholly outside its borders. *See Watson v. Emps. Liab. Assurance Corp.*, 348 U.S. 66, 70 (1954) (recognizing "the due process principle that a state is without power to exercise 'extra territorial jurisdiction,' that is, to regulate and control activities wholly beyond its boundaries"); *Home Ins. Co. v. Dick*, 281 U.S. 397, 407-08 (1930) (similar). In short, "[a] basic principle of federalism is that each State may make its own reasoned judgment about what conduct is permitted or proscribed within its borders, and each State alone can determine what measure of punishment, if any, to impose on a defendant who acts within its jurisdiction." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003) (emphasis added).

56. In addition to those general principles, the Commerce Clause, U.S. Const. art. I, §8, cl. 3, supplies a particular prohibition on extraterritorial regulation. Specifically, the Commerce Clause has long been interpreted to prohibit states from directly "control[ling] commerce occurring wholly outside [their] boundaries." *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 373, 376 & n.1 (2023); *Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982) (plurality op.); *see also, e.g.*, *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323 (9th Cir. 2015) (invalidating state law that "facially regulates a commercial transaction that 'takes place wholly outside of the State's borders'").

57. To be sure, the Supreme Court recently clarified that state laws regulating conduct within the state's borders are not categorically barred under the Commerce Clause just because they might have an indirect, "extraterritorial effect" in other states. *Ross*, 598 U.S. at 374. But, in doing so, the Court took pains to

COMPLAINT - 23
(No. _____)

clarify that that sort of law (*i.e.*, a state law that regulates in-state conduct only) is categorically different from a state law that "directly regulate[s] out-of-state transactions." *Id*. at 376 n.1 (2023) (emphasis omitted).

58. S.B. 5981 is unconstitutional under these principles and precedents. S.B. 5981 broadly bans all pharmaceutical manufacturers—many of whom have no physical presence in Washington—from "directly or indirectly" "deny[ing], restrict[ing], or prohibit[ing] the acquisition of a 340B drug by, or delivery of a 340B drug to, a covered entity, a pharmacy that is under contract with a covered entity to receive and dispense a 340B drug on behalf of the covered entity, or any location authorized by a covered entity to receive such 340B drug." §3(1). But much of the conduct that provision regulates—*e.g.*, transactions between manufacturers and covered entities—will take place entirely outside of Washington by manufacturers having no connection to the state. Nothing in S.B. 5981 purports to limit its application to transactions that occur within Washington.

59. None of PhRMA's members is headquartered in Washington.

60. Drug manufacturers, including PhRMA's members, primarily sell their drugs that end up in Washington through distributors, who are also located outside of Washington.

61. According to the Office of Pharmacy Affairs Information System ("OPAIS"), which is HRSA's public database with information about the 340B Program, covered entities located in Washington have over 2,600 contractual relationships with pharmacies. Of those, over 1,300 are with pharmacies located outside the State of Washington, including 8 contracts with pharmacies located in Hawaii.

62. Those contract pharmacies purport to dispense 340B-priced drugs to

COMPLAINT - 24
(No. _____)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

patients of covered entities located in Washington. As a result, Washington's law forbids drug manufacturers from imposing one-contract-pharmacy and claims-data conditions on the sale of drugs at 340B prices to covered entities that use contract pharmacies located outside of Washington to dispense those drugs.

63.    Additionally, in some circumstances where a Washington covered entity or pharmacy receives the 340B price on a drug from an out-of-state distributor, the out-of-state distributor then seeks the difference between the lower 340B price and the original price paid by the out-of-state distributor to the out-of-state manufacturer, including PhRMA's members, in a subsequent transaction. That subsequent transaction (known as a "chargeback") also occurs wholly outside Washington.

64.    As a result, S.B. 5981 regulates conduct occurring wholly beyond the borders of Washington. S.B. 5981 will apply to out-of-state transactions between out-of-state manufacturers and out-of-state distributors. Not only will it require manufacturers to provide the 340B price on transactions; it will also, given the offer-and-acceptance regime, force manufacturers to enter into many 340B transactions that they otherwise would not.

65.    By directly regulating commerce that occurs entirely outside of its borders, S.B. 5981 violates the Constitution's bar on extraterritorial state regulation. *See generally Ass'n for Accessible Meds. v. Ellison*, 140 F.4th 957 (8th Cir. 2025) (affirming preliminary injunction of a Minnesota law that barred manufacturers from "impos[ing], or caus[ing] to be imposed, an excessive price increase, whether directly or through a wholesale distributor, pharmacy, or similar intermediary, on the sale of any generic or off-patent drug sold, dispensed, or delivered to any consumer in the state"); *Styczinski v. Arnold*, 46 F.4th 907, 913 (8th Cir. 2022) (same as to

COMPLAINT - 25
(No. _____)

Minnesota law that regulated transactions with a "consumer who lives in Minnesota" because a trader could violate the law "without conducting a single transaction in Minnesota"); *Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664, 666-71 (4th Cir. 2018) (striking down a Maryland drug-pricing law that "directly regulates the price of transactions that occur outside Maryland[,]" where the law allowed "Maryland to enforce the Act against parties to a transaction that did not result in a single pill being shipped to Maryland"). It is invalid to that extent.

66.    And that is not the statute's only Commerce Clause problem: S.B. 5981 is also discriminatory. It privileges in-state interests by providing them monetary benefits not contemplated by Congress, while imposing a significant burden on out-of-state manufacturers.

67.    Finally, the extraterritorial reach of S.B. 5981 is further heightened by the remedies available for violations of Washington's law. S.B. 5981 authorizes prohibitory orders and injunctions, among other things. §4(2); Wash. Rev. Code §19.86.080(1)-(2). Of course, given that much of the conduct regulated will occur out of state, S.B. 5981 gives Washington state decisionmakers authority to regulate conduct far outside of Washington's borders—conduct that may be entirely lawful in the state in which it actually occurs.

## RELIEF REQUESTED

For the foregoing reasons, PhRMA respectfully requests that the Court:

a.    issue an order and judgment declaring that S.B. 5981 is unconstitutional and violates federal law;

b.    issue an order and judgment declaring that S.B. 5981 does not require PhRMA's members to offer, directly or through intermediaries including wholesalers and distributors, 340B pricing on their covered outpatient drugs to

COMPLAINT - 26
(No. _____)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

contract pharmacies in Washington or contract pharmacies located outside of Washington that fall within the ambit of the statute or transfer or cause their discounted covered outpatient drugs to be transferred to contract pharmacies;

c.     enjoin, preliminarily and permanently, the implementation and enforcement of S.B. 5981 against PhRMA's members and members' affiliates, officers, agents, representatives or contractors;

d.     enjoin, preliminarily and permanently, the implementation and enforcement of S.B. 5981 as to the sale of PhRMA's members' drugs under 340B;

e.     award PhRMA costs and reasonable attorneys' fees, as appropriate; and

f.     grant any other relief the Court finds just and appropriate.

DATED this 10th day of April, 2026.

CORR CRONIN LLP

*/s/ Steven W. Fogg*
Steven W. Fogg, WSBA No. 23528
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Phone: (206) 625-8600
Fax: (206) 625-0900
Email: sfogg@corrcronin.com

Erin E. Murphy, (*pro hac vice forthcoming*)
Matthew D. Rowe, (*pro hac vice forthcoming*)
Philip Hammersley, (*pro hac vice forthcoming*)
Camilo Garcia, (*pro hac vice forthcoming*)
CLEMENT & MURPHY PLLC
706 Duke Street
Alexandria, VA 22314
Phone: (202) 742-8900
Philip.Hammersley@clementmurphy.com
erin.murphy@clementmurphy.com
matthew.rowen@clementmurphy.com
philip.hammersley@clementmurphy.com
camilo.garcia@clementmurphy.com

*Attorneys for Pharmaceutical Research and Manufacturers of America.*

COMPLAINT - 27
(No. _____)